Filed 2/7/14  P. v. McNutt CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>      v.<br><br>DANIEL SHAWN McNUTT,<br><br>    Defendant and Appellant. | G049098<br><br>(Super. Ct. No. FVI700226)<br><br>O P I N I O N |

          Appeal from a judgment of the Superior Court of San Bernardino County, Eric M. Nakata and John M. Tomberlin, Judges.  Affirmed.

          Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

          Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Daniel Shawn McNutt appeals from a judgment after a jury convicted him of first degree residential burglary, assault with a firearm, corporal injury to a spouse and child's parent, criminal threats, four counts of child abuse, and possession of a firearm by a felon, and found true firearm and great bodily injury enhancements. McNutt argues the following: (1) insufficient evidence supports the trial court's conclusion he was competent to stand trial; (2) the court erred in admitting prior bad acts evidence and prior domestic violence evidence; (3) the court committed multiple instances of instructional error; and (4) insufficient evidence supports two of his conviction for child abuse. None of his contentions have merit, and we affirm the judgment.

FACTS & PROCEDURE

*Facts*

McNutt and Michelle K., who was about seven months pregnant, got married in December 2005. McNutt had two children from a previous relationship: M.M. and S.M. Michelle K. had a son from a previous relationship, T.C. Michelle K. gave birth to their son T.M., in February 2006. The marriage was good for the first couple of months until McNutt began leaving without warning; instead he would leave a note on Michelle K.'s car.

On Thanksgiving 2006, McNutt was distant. After dinner, he took M.M. and S.M. to his mother's house. Later, McNutt called Michelle K. and said they were going to spend the night at his mother's house. Michelle K. told McNutt that if he did not bring the children back, their relationship was over. He did not return, and later she told him that she was ending their relationship.

McNutt initially accepted her decision but soon changed his mind and told her that he wanted to reconcile. Michelle K. also wanted to reconcile, and she told him to find a place for them to live because he could not move in with Michelle K. at her mother's house. When McNutt failed to arrange for housing, Michelle K. decided to seek a divorce. When Michelle K. went to the courthouse in January 2007 to file for divorce,

2

McNutt had literally beaten her to the courthouse; he was "three people" ahead of her in line. After McNutt filed for divorce, their relationship deteriorated further when McNutt learned Michelle K. was dating another man.

On February 26, 2007, McNutt, M.M., and S.M. went to Michelle K.'s house for a scheduled visit. T.M., T.C., Michelle K., Michelle K.'s mother, and her boyfriend were there. After dinner, Michelle K.'s mother and her boyfriend left. McNutt played with T.M. and ignored Michelle K. When it was time for McNutt to leave, Michelle K. put on M.M.'s and S.M.'s coats and told McNutt it was time to leave. McNutt, who was pacing, asked Michelle K. for a glass of water, which she got for him. T.C. sat at a computer desk with his back to everyone. McNutt drank the water and refilled his glass. Michelle K. again told McNutt it was time to leave.

McNutt walked towards T.C., pulled a handgun from his pants, pointed the gun at the back of T.C.'s head, and told him to get on the ground. McNutt told Michelle K. that "if [she] didn't shut up and get down on the ground he was going to kill [T.C.]." McNutt grabbed T.C., threw him on the ground, sat on his back, and held his hands behind his back.

After Michelle K. got on the ground and put her hands behind her head, she begged McNutt not to harm T.C. As Michelle K. grabbed McNutt and tried to pull him down, she told T.C. to run, and he ran out of the sliding glass door to a neighbor's house to call the police; 911 was called at about 8:53 p.m. McNutt pointed the gun at S.M. and M.M. and told them to go to the bathroom, which they did, and he locked the door.

McNutt picked up Michelle K. by the hair, punched her several times on the face, wrapped his arm around her neck, hit her head with the butt of the gun, and put the gun to her head. McNutt told Michelle K. to tell T.C. to return home or he was going to kill her. Michelle K., whose head was bleeding, told T.C. not to return. McNutt yelled, "'[T.C.], if you don't come back in, I am going to fucking kill her.'" When T.C.

3

returned, McNutt told him to get a towel to wipe the blood from Michelle K.'s head and hand and threatened to shoot Michelle K.

As Michelle K. tried to pull McNutt's hair and grab the gun, she again told T.C. to leave, which he did. McNutt threw Michelle K. over a couch, threw her onto a table, tried to strangle her, and put the gun to her head. Michelle K. fought back as best she could. At some point, McNutt grabbed a knife from the kitchen and held it like he was going to stab her. McNutt dragged Michelle K. through the house by her hair and left arm. He struck her arm with his fist and gun, shattering her elbow. McNutt dragged Michelle K. into the garage and hogtied her; she heard the police arrive. When Michelle K. broke free, McNutt dragged her back into the house. She tried to get away, and he threw her onto a table and tried to strangle her. McNutt pointed the gun at her and tried to cock it, but Michelle K. struggled to get it away from him and in the struggle the gun went off and she pinched her finger in the gun.

McNutt dragged Michelle K. into her mother's bedroom and threw her onto the bed face down. McNutt turned off the lights and closed the blinds. McNutt held Michelle K. face down on the bed. When Michelle K. heard T.M. crying, she asked McNutt to let the children go, and he told her, "shut the fuck up, shut up, stupid bitch." Michelle K. told him she was cold, thirsty, and thought she was dying. He replied, "[S]hut up, bitch. You're fine." McNutt picked her up and sat her down in the hallway facing the bathroom door. After an unsuccessful attempt at freeing the children from the bathroom, Michelle K. ran down the hall into T.M.'s bedroom. As Michelle K. closed the door, McNutt barged through the door, which propelled Michelle K. backwards into the closet doors, breaking them. He grabbed her hair and dragged her into T.C.'s room where he set her against the door to prevent anyone from entering. McNutt "smush[ed]" their heads together and put the gun to their heads saying he was going to kill both of them. Michelle K. convinced McNutt to let her get T.M., and they got him and returned

4

to T.C.'s room.  McNutt "smush[ed]" his, Michelle K.'s, and T.M.'s head together and put the gun to each of their heads.

At about 9:15 p.m., Deputy Lee Medeiros arrived and entered the house and saw blood.  Michelle K. yelled to the officer that McNutt told the officer to leave, that she was bleeding from the head, and that he was making her "'take the baby'" and "'get the baby.'"  Medeiros saw McNutt holding a gun to the back of Michelle K.'s head, backed away, and heard a door shut.  Eventually, Medeiros, Sergeant Kimberly Watkins, and other officers attempted to speak with McNutt through the door.  Officers heard S.M. and M.M. in the bathroom, and they were taken outside.  Watkins initially communicated with McNutt through Michelle K. because McNutt was not wearing his hearing aid until a deputy retrieved his hearing aid from the garage and slid it under the door.[1]  Michelle K. said her head was bleeding and her arm was broken.  Watkins asked McNutt to let T.M. go but McNutt said he could not do that.  McNutt stated he was born without ear lobes and described his difficult childhood.  McNutt regretted leaving Michelle K. without warning and feared she was going to leave him.  McNutt finally opened the door slightly and handed T.M. to Watkins, who grabbed him and took him outside.  Watkins eventually convinced McNutt to surrender.  The door opened, Michelle K. ran out, and officers found McNutt face down on the ground with his hands behind his neck; a deputy handcuffed him.
Deputies recovered the gun, two .22 caliber bullets from McNutt's pockets, and five .22 caliber bullets in the house; deputies did not find any shell casings.

Michelle K. was transported to the hospital, where she remained for four days.  She had cuts to her head, forehead, and elbow.  She required stitches on two different places on her head.  Her elbow was shattered, and her forearm was broken.

---

[1]     Michelle K. testified, "Without his hearing aid he can hear vibration, so if he puts his hand on you he can hear you talk."

5

*Procedure*

In February 2007, a felony complaint charged McNutt with six offenses, including two counts of attempted murder. At the preliminary hearing that July, McNutt's defense counsel (deputy public defender Ray Hallard) doubted McNutt was competent to stand trial. The trial court suspended criminal proceedings and ordered a mental health expert to evaluate McNutt pursuant to Penal Code section 1368.[2] At the next scheduled hearing, McNutt's counsel indicated Dr. Mendel Feldsher had submitted a report dated July 23, 2007, and requested a second mental health evaluation. The court granted counsel's request. At a hearing the following month, McNutt's counsel indicated psychologist Stuart Courtney had submitted a report dated August 23, 2007. After both parties submitted on the report, the court (Judge Annemarie G. Pace) found McNutt was mentally competent to stand trial and reinstated criminal proceedings. The following week, the prosecutor filed a 16-count first amended felony complaint and later McNutt was held to answer.

At a pre-trial hearing months after the prosecutor filed a 15-count information, McNutt's counsel, a different deputy public defender (Maggie Eisenberg), again doubted McNutt was competent to stand trial. The trial court (Judge J. David Mazurek) suspended criminal proceedings and ordered a mental health expert to evaluate McNutt pursuant to section 1368. Over the course of five months, the following mental health reports were prepared and filed with the court: (1) Feldsher on February 24, 2008; (2) Feldsher addendum to February 24, 2008, report on April 7, 2008; (3) psychologist Taylor Cantrell on June 9, 2008; and (4) Feldsher on August 20, 2008. At a hearing in August 2008, both parties requested a trial on the issue of McNutt's competency to stand

---

[2] All further statutory references are to the Penal Code, unless otherwise indicated.

trial.  After a six-day jury trial in February and March 2009 (Judge Miriam Ivy Morton), the jury found McNutt competent to stand trial.

At a hearing in July 2009, the trial court (Judge Miriam Ivy Morton) explained it had been four months since the competency trial, the court had observed McNutt's behavior, and after failing to elicit a time waiver from McNutt, the court doubted his ability to stand trial.  McNutt's counsel indicated she had been unable to communicate with McNutt, and she doubted his ability to assist her in preparing a defense.  Over the prosecutor's objection, the court again suspended criminal proceedings and ordered McNutt to undergo further mental health evaluations; the prosecutor filed a writ challenging the court's order.

Two months later at a hearing, the trial court stated it had received reports from psychologists Randall Norris dated August 23, 2009, and Stacy L. McClain dated August 26, 2009.  The court added that all proceedings were stayed pending the disposition of the prosecutor's writ, which was later denied.

At a hearing in January 2010, the prosecutor requested Courtney conduct a supplemental evaluation of McNutt.  The court ordered Feldsher, Cantrell, and Courtney to all submit supplemental reports, which they did (Feldsher report dated February 7, 2010; Cantrell report dated February 8, 2010; and Courtney report dated February 8, 2010).  After a three-day court trial in June 2010, the trial court, Judge Eric M. Nakata, concluded McNutt was not competent to stand trial.  On July 28, 2010, the trial court ordered McNutt committed to Patton State Hospital until his mental competence was restored.

The following year, on September 9, 2011, a court trial (Judge Eric M. Nakata) on McNutt's competency took place.  The trial court acknowledged receipt of the following:  (1) a report prepared by psychologist Dr. Allen M. Kilian and psychiatrist Dr. Rufino Co from Patton State Hospital; and (2) a certification of mental competence prepared by Dr. George Christison.  McNutt's defense counsel (deputy public defender

7

William Figueroa) offered McNutt's testimony to demonstrate his mental incompetence because counsel had been unable to communicate with McNutt or secure an expert to testify. We provide his testimony in full. On direct examination, the following colloquy occurred:

"[Counsel]: Good morning, Mr. McNutt. [¶] Mr. McNutt, good morning. [¶] Can you state your name for the record? What is your name, sir?

"[McNutt]: Daniel.

"[Counsel]: Okay. And what is your last name?

"[McNutt]: McNutt.

"[Counsel]: And do you know your date of birth, Mr. McNutt?

"[McNutt]: 7-1-72.

"[Counsel]: Okay. Now, we're in court today on a felony case. Are you aware of the felony case, Mr. McNutt?

"[McNutt]: I'm not sure what you're talking about.

"[Counsel]: You're not sure what I'm talking about. This case happened in 2007 with children and family members. Do you remember that case?

"[McNutt]: What case?

"[Counsel]: Okay. Are you currently under medication, Mr. McNutt? Do you take medicine?

"[McNutt]: I don't want to take any.

"[Counsel]: But does the jail give you medicine every day?

"[McNutt]: They try.

"[Counsel]: Okay. Do you know what those medications are?

"[McNutt]: (No response.)

"[Counsel]: Mr. McNutt, how long have you been in custody? Do you know how long you've been in jail?

"[McNutt]: A couple years.

8

"[Counsel]: Okay. Do you know what you're charged with, what the felony charges are in this case?

"[McNutt]: I don't understand. No.

"[Counsel]: Pardon me?

"[McNutt]: Charges?

"[Counsel]: They were the same charges that were originally there. Do you know that you're charged with attempted murder in this case?

"[McNutt]: No.

"[Counsel]: Do you know that you're charged with corporal injury to a spouse, you're charged with criminal threats and burglary? Do you know those are all serious felonies?

"[McNutt]: I don't have those.

"[Counsel]: Now, as you sit here today, Mr. McNutt, are you able to assist me in helping you defend those charges if we go to trial? Are you going to be able to help me?

"[McNutt]: No.

"[Counsel]: And then lastly, Mr. McNutt, do you understand the nature and quality of these charges, that they're violent crimes and charged as felonies?

"[McNutt]: I guess.

"[Counsel]: Okay. Now, what do you mean by 'I guess'? Do you know the difference between a felony and a misdemeanor?

"[McNutt]: It don't make no sense to me. I'm just here.

"[Counsel]: Okay. You're just here. And have you gotten any kind of treatment or new medications over the last couple of months that help you understand what's going on here today, or are you in the same situations that you've always been?

"[McNutt]: I don't know how to answer that.

9

"[Counsel]: Okay. Do you feel that the treatment and the medications that you have been receiving for the last several months have helped you understand what you situation is now? Do you feel better today with the medication and treatment that you're getting?

"[McNutt]: I don't feel better.

"[Counsel]: Do you understand the charges and you're able to help me defend those charges?

"[McNutt]: I'm not sure what you're talking about here.

"[Counsel]: Why aren't you sure what I'm talking about? What don't you understand?

"[McNutt]: It doesn't make any sense.

"[Counsel]: You're here on a felony case and there's felony charges; right? Do you understand that?

"[McNutt]: (No response.)"

On cross-examination, the following colloquy occurred:

"[Prosecutor]: Mr. McNutt, do you know who Michelle [K.] is? Do you remember being married to Michelle?

(Pause.)

"[McNutt]: Is he talking to me?

"[Prosecutor]: Yes. I'm talking to you, Mr. McNutt. Do you know who Michelle is?

"[McNutt]: There's a lot of Michelles I knew.

"[Prosecutor]: Did you used to be married to somebody named Michelle?

"[McNutt]: I was married to Shalina.

"[Prosecutor]: Okay. You had another girlfriend named Shalina?

"[McNutt]: No. That was my wife.

"[Prosecutor]: All right. Did -- do you have any children?

10

"[McNutt]: A couple.

"[Prosecutor]: Okay. Can you give me any of their names?

"[McNutt]: [M.M.] and [S.M.].

"[Prosecutor]: Okay. Do you remember a time when you were arrested a few years ago for an incident with a gun where [S.M.] and [M.M.] were there?

"[McNutt]: (No response.)

"[Prosecutor]: Do you understand, Mr. McNutt, that you could get life in prison if you're convicted in this case?

"[McNutt]: (Witness shakes head.) I don't.

"[Prosecutor]: You have no idea?

"[McNutt]: I'm just -- I'm just trying to go to the underworld.

"[Prosecutor]: You're trying to what?

"[McNutt]: I'm just trying to go to the underworld. People are trying to stop me."

"[Prosecutor]: Okay."

The prosecutor offered the testimony of Kilian, a clinical psychologist at Patton State Hospital. After detailing his background, training, and experience, Kilian testified he assessed McNutt, including interviewing him and reviewing the prior written mental health evaluations, and prepared a written report. Kilian also observed McNutt's testimony.

Kilian testified that during the interview McNutt "presented with a vague report of symptoms, nondescript, fairly nonresponsive" and he believed "[McNutt] might be either exaggerating his experience of psychological symptoms or suppressing his cognitive ability and/or suppressing his level of court knowledge." Kilian opined McNutt's behavior during the interview was "quite similar" to his behavior during his testimony. Kilian explained that if a patient "present[s] with significant thought disorder and/or endorsement of auditory delusionations or thought process, they present with

11

symptoms that are quite dissimilar to" McNutt's presentation during his testimony and during his interview. Kilian stated that patients who are hallucinating typically are "quick to respond," are "verbos[e]," and do not respond with "'I don't know' or a vague, nondescript answer." Relying on Courtney's prior evaluation, Kilian found it important McNutt scored "below chance" on testing, which suggests McNutt was malingering. Kilian explained that in testing, a patient has a 50 percent chance of choosing the correct answer for a question, and if the patient scores "significantly below chance," it suggests the patient intentionally chose the incorrect answer.

Kilian testified McNutt described a visual hallucination in the form of an individual named "Buddy" who was instructing McNutt when to die. Kilian opined McNutt's description of the hallucination was "dissimilar" to other patients "with distinct and even well-formed delusional processes." Kilian also said McNutt's description of "Buddy" changed over the years and that "raises red flags." Kilian testified that various tests indicated McNutt had a tendency to "suppress his level of court knowledge or to feign a deficit in court knowledge." Kilian also stated that during McNutt's stay at Patton State Hospital, he followed rules and communicated with his peers. Based on his assessment of McNutt, Kilian opined McNutt was able to understand court proceedings and communicate with his attorney, and was competent to stand trial.

On cross-examination, Kilian acknowledged that of the five doctors who evaluated McNutt four concluded he was not competent to stand trial. Kilian conceded it was "very possible" test results could change in the 11 months that had passed. On redirect examination, Kilian stated, however, there was no "particular reason" his opinion would change.

The trial court asked Kilian, "Did Mr. McNutt present himself any differently today while testifying than he did when you interviewed him back in October of last year?" Kilian answered, "It was very similar."

12

After stating he would take judicial notice of the reports submitted at the June 2010 trial and that he had a degree in psychology, the trial judge ruled as follows: "The testimony of [Kilian] here is truly significant given the fact that . . . McNutt presents himself very similarly to the way he did previously. I think that that is truly the telling -- you know, I think that it was a good tactic by the [prosecutor] to see that perhaps there was degradation of . . . McNutt since it's been almost a year that he was evaluated. But given the fact that he presents himself in a very similar fashion, I have no reason to believe that the conclusion of . . . Kilian is any different now than it was, and I will find that he's competent. He does not fall within the purview of [section] 1368, and that criminal proceedings are reinstated."

In April 2012, a second amended information charged McNutt with the following offenses: attempted willful, deliberate, and premeditated murder (§§ 664, 187, subd. (a)) (count 1); first degree residential burglary (§ 459) (count 2); assault with a firearm (§ 245, subd. (a)(2)) (count 3); corporal injury to spouse and child's parent (§ 273.5, subd. (a)) (count 4); criminal threats (§ 422) (count 5); four counts of felony child abuse (§ 273a, subd. (a)) (count 6-S.M.; count 7- M.M.; count 8-T.M.; count 9-T.C.); false imprisonment of a hostage (§ 210.5) (count 10); and possession of a firearm by a felon (§ 12021, subd. (a)(1)) (count 11). It alleged McNutt personally used and personally and intentionally discharged a firearm as to count 1 (§ 12022.53, subds. (b) & (c)). As to counts 1, 2, 4, and 10, it alleged he personally inflicted great bodily injury on Michelle K. (§ 12022.7, subd. (e)). With respect to all but count 11, it also alleged he personally used a firearm (§ 12022.5, subd. (a)). It also alleged McNutt suffered a prior serious and violent felony conviction (§§ 667, subds. (a)-(i), 1170.12, subds. (a)-(d)), and suffered a prior prison term (§ 667.5, subd. (b)).

Before trial, the prosecutor filed a trial brief that included in limine motions. The prosecutor sought to admit the following evidence: (1) a July 15, 2005, incident where McNutt attacked Michelle K. with a knife pursuant to Evidence Code

13

section 1109; and (2) a prior 1992 conviction for attempted murder for impeachment purposes.

At a pre-trial hearing, defense counsel objected to admission of the evidence. With respect to the prior domestic violence evidence, defense counsel argued the evidence was relevant only to count 4, and it was unduly prejudicial without a limiting instruction. The prosecutor asserted the evidence was relevant as to counts 1, 2, 4, 5, and 10. The court opined the evidence was admissible on the issue of whether Michelle K. suffered sustained fear and pursuant to Evidence Code section 1109. The court opined the evidence's probative value outweighed its prejudicial effect. The court stated it would instruct the jury it could consider this evidence only as to counts 1, 2, 4, 5, and 10. As to the 1992 attempted murder conviction, the prosecutor explained Michelle K. would testify she was extremely scared on the day of the incident because she knew McNutt had been convicted of attempted murder. Over defense counsel's objection, the court opined the evidence was "highly probative, extremely probative, and more probative than it is prejudicial[.]"

A jury trial commenced on April 16, 2012, before Judge John M. Tomberlin. At trial, Michelle K. testified that in July 2005, five months before she married McNutt, she was a couple months pregnant with T.C. and she got upset with McNutt because he would not help her assemble a swimming pool. Michelle K. stated that after they argued, McNutt pulled a knife and held it near her face. She said he punched her on the head, causing her to lose consciousness. She called the police, and McNutt was arrested. The parties stipulated that on July 27, 2005, McNutt was convicted of assault with a deadly weapon, a knife, and domestic violence in Kern County. Michelle K. also testified that at T.M.'s birthday party two days before the incident, McNutt told her that she needed to stop seeing her boyfriend because it was making him very angry. When the prosecutor inquired whether McNutt said anything else, defense counsel objected on hearsay grounds. The court overruled the objection. Michelle K.

14

testified, "[McNutt] proceeded to tell [her] that he was going to or wanted to kill his mother and stepfather."  Defense counsel objected on relevancy grounds and moved to exclude the evidence.  The court overruled the objection.  Defense counsel did not object to this evidence on

Evidence Code section 352 grounds.  As to the incident here, the prosecutor asked Michelle K. whether she was afraid when McNutt put the gun to T.C.'s head.  She replied, "Absolutely, yes."  The prosecutor inquired whether McNutt had ever told her that he had been convicted of a crime.  She answered, "He had told [her] that he had spent

seven years in prison for an attempted murder when he was around 18."  She added his conviction for attempted murder made her "realize[] . . . he was not afraid to kill somebody."

The jury convicted McNutt of all counts, except count 1, attempted murder and count 10, false imprisonment of a hostage, and found true the related firearm and great bodily injury enhancements.  In a bifurcated proceeding, McNutt admitted he suffered a prior strike conviction and served a prior prison term.

At the sentencing hearing, the trial court denied McNutt's motion to strike his prior conviction pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 529-530.  The court sentenced McNutt to 48 years[3] in prison as follows: (1) count 2-the upper term of six years doubled to 12 years (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), five years for personally inflicting great bodily injury

---

[3]      At the conclusion of sentencing McNutt, the trial court stated the total term was 50 years.  Based on a complete reading of the transcript of the sentencing hearing, however, we conclude the trial court misspoke.  The sentences on counts 2, 6, 7, 8, and 9 total 48 years.  The court imposed and stayed the sentences on counts 3, 4, 5, and 11.  The confusion can likely be attributed to count 4, where the court initially sentenced McNutt to two years, recalculated the sentence at 15 years after realizing it had omitted the enhancements, and then stayed the sentence.  The abstract of judgment accurately reflects McNutt's total prison sentence is 48 years.

(§ 12022.7, subd. (e)), 10 years for personally using a firearm (§ 12022.5, subs. (a)), and five years for the prior felony conviction (§ 667, subd. (a)), for a total term of 32 years; and (2) counts 6, 7, 8, and 9: one-third the middle term of one year and four months doubled to two years and eight months (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), plus one-third the middle term of one year and four months for personally using a firearm (§ 12022.5, subs. (a)), to run consecutively. Pursuant to section 654, the court imposed and stayed the sentences on counts 3, 4, 5, and 11. The court granted the prosecutor's motion to dismiss counts 1 and 10.

DISCUSSION

*I. Competency*

McNutt argues insufficient evidence supports the trial court's conclusion he was competent to stand trial. We disagree.

Due process prohibits trial of a criminal defendant who is mentally incompetent. (*People v. Ary* (2011) 51 Cal.4th 510, 517 (*Ary*).) "A defendant is deemed competent to stand trial only if he '"has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding"' and '"has a rational as well as factual understanding of the proceedings against him."'" (*Ibid*.) "When a trial court is presented with evidence that raises a reasonable doubt about a defendant's mental competence to stand trial, federal due process principles require that trial proceedings be suspended and a hearing be held to determine the defendant's competence. [Citations.] Only upon a determination that the defendant is mentally competent may the matter proceed to trial." (*Ary, supra,* 51 Cal.4th at p. 517.)

Sections 1367 through 1369 reflect these constitutional requirements. Section 1367, subdivision (a), states: "A person cannot be tried or adjudged to punishment while that person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder . . . , the defendant is unable to understand the nature of the criminal proceedings or to assist

16

counsel in the conduct of a defense in a rational manner." Section 1368, subdivision (a), requires a trial court to suspend criminal proceedings at any time prior to judgment if the court reasonably doubts the defendant's mental competence. Section 1369 requires the appointment of mental health experts to evaluate the defendant's mental competence, and allows the defense and prosecution to present evidence to either support or counter a claim of the defendant's mental incompetence to stand trial.

"A defendant is presumed competent unless the contrary is proven by a preponderance of the evidence. (§ 1369, subd. (f) . . . .) On appeal, the reviewing court determines whether substantial evidence, viewed in the light most favorable to the verdict, supports the finding on competency. [Citation.] Evidence is substantial if it is reasonable, credible and of solid value. [Citation.]" (*People v. Dunkle* (2005) 36 Cal.4th 861, 885 (*Dunkle*), overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Here, sufficient evidence supports the trial court's conclusion McNutt was competent to stand trial. After considering the written reports and hearing McNutt's and Kilian's testimony, the court concluded McNutt was competent to stand trial. The court found it dispositive that McNutt's demeanor during the competency hearing was similar to his demeanor during his interview with Kilian. (*People v. Ramos* (2004) 34 Cal.4th 494, 507-508 (*Ramos*) [evidence of incompetence may emanate from defendant's demeanor, irrational behavior, and prior mental health evaluations]; *People v. Kaplan* (2007) 149 Cal.App.4th 372, 383 [same].) Kilian stated that during the interview, McNutt's presentation was "dissimilar" to patients with "significant thought disorder," including his auditory delusions and visual hallucinations, which changed over time. Kilian explained that testing indicated McNutt deliberately chose the incorrect answer to illustrate he was mentally incompetent. Based on all these factors, Kilian opined McNutt was either exaggerating his psychological symptoms or suppressing his cognitive ability. Kilian's expert testimony was sufficient evidence for the trial court to reasonably

17

conclude McNutt was competent to stand trial. (*People v. Vega* (2005) 130 Cal.App.4th 183, 190-191 [testimony of expert witness sufficient to constitute substantial evidence].)

McNutt claims the trial court erred in concluding he was competent to stand trial based on the following: (1) Kilian's opinion was "inconsistent with the majority of prior opinions from several psychological experts"; (2) McNutt's demeanor and testimony at the competency hearing established he could not understand the nature of the proceedings against him; and (3) Kilian was unable to confirm he was malingering.

First, McNutt essentially urges us to reweigh the evidence on appeal and substitute our judgment for the trial court's judgment. That we cannot do. (*Dunkle, supra,* 36 Cal.4th at p. 885.)

Second, our Supreme Court has recognized that, "if a qualified mental health expert who has examined the defendant '"states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel,"' that is substantial evidence of incompetence. [Citations.]" (*People v. Lewis* (2008) 43 Cal.4th 415, 525.)

Here, McNutt offered no expert testimony about his mental health at the competency hearing. He relied solely on his own testimony, including his statements he was "just trying to go to the underworld[]" and "[p]eople are trying to stop [him]." (*Ramos, supra,* 34 Cal.4th at p. 508 [defendant must exhibit more than bizarre, paranoid, or strange behavior].) The trial court heard and considered McNutt's testimony and found it dispositive his demeanor during the competency proceeding was similar to his demeanor during Kilian's evaluation, after which Kilian concluded he was competent to stand trial.

Finally, McNutt suggests Kilian's expert opinion he was competent to stand trial must be discounted because Kilian was unable to demonstrate he was malingering. McNutt's attempt to shift the burden of proof to the prosecutor fails. McNutt was

18

required to establish by a preponderance of the evidence he was not malingering, i.e., he could not rationally and factually understand the nature of the proceedings against him. This he failed to do. Thus, McNutt failed to rebut the presumption of competency and demonstrate by a preponderance of the evidence he was incompetent to stand trial.

## II. Evidentiary Issues

### A. Prior Conviction & Threat

Relying on Evidence Code sections 1101 and 352, McNutt asserts the trial court erred in admitting evidence of his 1992 attempted murder conviction and evidence that two days before the incident, he threatened to kill his mother and stepfather. The Attorney General contends the court did not admit this evidence pursuant to Evidence Code sections 1101 and 352 but instead pursuant to general relevancy principles on the issue of Michelle K.'s fear. McNutt does not respond to the Attorney General's claim but continues with his assertion the evidence was improper character evidence.[4] As we explain below, even if the court erred in admitting the 1992 attempted murder conviction, we conclude McNutt was not prejudiced by the error. Additionally, McNutt's claim the court erred in admitting evidence of a prior threat against other family members is forfeited for failing to object pursuant to Evidence Code section 352.

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) Relevant evidence is "evidence . . . having any tendency in reason to prove or disprove

---

[4] One other note. On page 30 of his opening brief, McNutt argues the trial court erred in admitting evidence of his 1992 attempted murder conviction and his threat to kill his family members. McNutt does not mention the evidence of his threat to kill his family members again, and he limits the 10 pages of argument to the 1992 attempted murder conviction. In his reply brief, McNutt discusses the threat. Nevertheless, we will address McNutt's contention concerning the admission of evidence he threatened to kill his family members despite his failure to provide any reasoned argument on this point in his opening brief. (Cal. Rules of Court, rule 8.204(a)(1)(B); *People v. Stanley* (1995) 10 Cal.4th 764, 793.)

19

any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Although "'there is no universal test of relevancy, the general rule in criminal cases [is] whether or not the evidence tends logically, naturally, and by reasonable inference to establish any fact material for the prosecution[.]'" (*People v. Freeman* (1994) 8 Cal.4th 450, 491.)

Evidence Code section 352, however, authorizes a trial court to exclude relevant evidence. "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) For purposes of Evidence Code section 352, prejudice means "'evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues. [Citation.]'" (*People v. Heard* (2003) 31 Cal.4th 946, 976.) We review a trial court's evidentiary rulings for an abuse of discretion. (*People v. Davis* (2009) 46 Cal.4th 539, 602.) "A trial court abuses its discretion when its ruling 'fall[s] "outside the bounds of reason."' [Citations.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 714.)

Count 5 charged McNutt with making a criminal threat in violation of section 422. The elements of the criminal threat offense are: "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in

20

sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]"  (§ 422; *People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)

*People v. Garrett* (1994) 30 Cal.App.4th 962 (*Garrett*), is instructive.  In that case, defendant was convicted of making a criminal threat in violation of section 422. When defendant called wife from a tattoo parlor on pay day, wife angrily hung up the telephone because the family was without food.  Defendant called his wife back, threatened to beat her, and stated, "'[Y]ou better sit here on this . . . phone and listen to me, because when I get off this phone, I'm coming there to put a bullet in your head.'" (*Id.* at p. 965.)  The trial court admitted evidence defendant's wife knew about his prior conviction for manslaughter, and that he had beaten her on prior occasions.  (*Id*. at p. 966.)  The *Garrett* court held the evidence was admissible "for the purpose of establishing crucial elements" of the charged offense because wife's knowledge of defendant's prior conduct is relevant in establishing wife was in sustained fear.  (*Id*. at p. 967.)  In explaining why the evidence was not unduly prejudicial, the court stated, "Seldom will evidence of a defendant's prior criminal conduct be ruled inadmissible when it is the primary basis for establishing a crucial element of the charged offense." (*Id.* at p. 967.)  The court concluded the evidence was not propensity evidence admitted in violation of Evidence Code section 1101, subdivision (a), but instead for establishing crucial elements of the charged offense.  (*Garrett, supra,* 30 Cal.App.4th at pp. 967-968.)

Here, evidence McNutt was convicted of attempted murder in 1992 and he threatened to kill his mother and stepfather two days before the incident was relevant to prove Michelle K. was in sustained fear for her and her family's safety and that her fear was reasonable.  The evidence at trial demonstrated McNutt put a gun to T.C.'s head and threatened to kill him if Michelle K. did not get on the ground.  A little later after T.C. ran outside, McNutt threatened to kill Michelle K. if T.C. did not return.  Like *Garrett*, evidence McNutt had previously been convicted of attempted murder and he threatened

21

to kill other family members days before the incident was relevant to crucial elements of the offense of count 5, making criminal threats.

Acknowledging the evidence "was arguably probative" and "had some pertinence," McNutt's real complaint is the evidence was unduly prejudicial. With respect to the evidence McNutt threatened to kill his mother and stepfather, this evidence was not the subject of an in limine motion, and McNutt did not object to its admission on Evidence Code section 352 grounds. He objected on the ground the evidence was hearsay, a claim he does not raise on appeal, and on the ground it was not relevant, which as we explain above it was. Thus, his claim admission of evidence of a prior threat against other family members was unduly prejudicial is forfeited. (*People v. Hardy* (1992) 2 Cal.4th 86, 148 [failure to object on Evid. Code § 352 grounds waived claim for appeal].)

As to the evidence McNutt suffered a 1992 attempted murder conviction, we review a trial court's evidentiary rulings under the deferential abuse of discretion standard. The court in *Garrett, supra,* 30 Cal.App.4th at page 967, stated, "Seldom will evidence of a defendant's prior criminal conduct be ruled inadmissible when it is the primary basis for establishing a crucial element of the charged offense." Here Michelle K.'s testimony's she was extremely scared on the day of the incident because she knew McNutt had been convicted of attempted murder, was clearly relevant. Admittedly, other significant evidence was offered on the issue of prolonged fear, specifically Michelle K.'s emotional and detailed testimony about McNutt's vicious and prolonged attack on her and his threats to kill her son. The jury could rely on Michelle K., T.C., and M.M.'s testimony to conclude Michelle K. was in sustained fear. But we cannot say the trial court's ruling was outside the bounds of reason, and therefore, we find no error.

As we indicated initially, even if we were to find admission of 1992 attempted murder conviction was error, we would conclude it was harmless. Although McNutt asserts the standard of review is the "harmless beyond a reasonable doubt"

22

standard prescribed in *Chapman v. California* (1967) 386 U.S. 18, 24, the California Supreme Court has held the application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations of error under the "reasonable probability" standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Marks* (2003) 31 Cal.4th 197, 226-227 (*Marks*); *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1125; *People v. Fudge* (1994) 7 Cal.4th 1075, 1103.) Although we apply *Watson*, we note that the result would be the same under *Chapman*.

Here, there was overwhelming evidence supporting McNutt's convictions for counts 3, 4, 5, 6, and 7.[5] As we explain below more fully, there was sufficient evidence for the jury to convict McNutt of counts 6 and 7 because the record includes evidence from which the jury could reasonably conclude McNutt acted under circumstances or conditions likely to produce great bodily harm or death in four-year-old S.M. and five-year-old M.M. when he pointed a gun at them and ordered them into the bathroom.

Additionally, overwhelming evidence supports his conviction on count 3 as both Michelle K. and T.C. testified McNutt put the gun to T.C.'s head. T.C. testified he felt the gun on the back of his head. And officers recovered the gun and bullets after they arrested McNutt. Overwhelming evidence also supports count 4, corporal injury to a spouse, as there was overwhelming evidence McNutt brutally and viciously attacked Michelle K. and she suffered significant injuries as a result of the attack. McNutt asserts Michelle K. had significant credibility issues because of her and T.C.'s personal animosity against him but the jury heard that evidence and rejected it. The fact the jury acquitted McNutt of two counts, count 1, attempted murder, and count 10, false imprisonment of a hostage, demonstrates the jury carefully weighed and considered all

---

[5] McNutt limits his discussion to these counts. He also claims he was prejudiced as to count 10, but the jury acquitted him of that count. We will limit our discussion accordingly.

23

the evidence and undercuts his assertion the jury improperly relied on the 1992 attempted murder conviction and improperly set out to punish him.

Finally, sufficient evidence supports count 5, making a criminal threat. There was overwhelming evidence McNutt threatened to kill Michelle K. and T.C. and he specifically intended his statements to be taken as threats. McNutt pointed a gun at T.C.'s head and physically restrained him, and then viciously attacked Michelle K. And there is no question Michelle K. was in sustained fear and that her fear was reasonable. When the prosecutor asked her whether she was in fear, she replied, "Absolutely, yes." Additionally, the jury could reasonably conclude based on the nature of the brutal attack, being thrown and dragged around the house and repeatedly beaten, that Kanksi was afraid as she suffered through this ordeal. We conclude there was overwhelming evidence supporting McNutt's convictions. Thus, even if admission of the 1992 attempted murder conviction was error, it did not contribute to his convictions.

B. *Domestic Violence*

1. *Admission of Evidence*

Relying on Evidence Code sections 1109 and 352, McNutt argues the trial court erred in admitting evidence that in July 2005 he committed domestic violence against Michelle K. Not so.

Evidence Code section 1101, subdivision (a), prohibits the use of disposition or propensity evidence to prove a defendant's conduct on a specific occasion. (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).) However, Evidence Code section 1109, subdivision (a)(1), provides, "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] [s]ection 1101 if the evidence is not inadmissible pursuant to [Evidence Code] [s]ection 352." Evidence Code section 352's standard is provided above.

24

*People v. Jennings* (2000) 81 Cal.App.4th 1301 (*Jennings*), is instructive. In that case, defendant was convicted of felony assault and aggravated assault by means of force likely to produce great bodily injury and other crimes against his girlfriend. (*Id.* at p. 1305.) The trial court admitted evidence of three prior incidents of domestic violence. In the first, defendant hit the victim three or four times and then kicked in her apartment door. In the second, defendant slapped the victim in a jealous rage. In the third, when the victim refused to drop the domestic violence charges pending as a result of the earlier incidents, defendant straddled the victim in bed, stuck his finger in her eye, hit her on the leg, and choked her. (*Id.* at p. 1307.) The *Jennings* court rejected defendant's contention the trial court erred in not excluding this evidence under Evidence Code section 352, reasoning the prior incidents of domestic abuse "were no more egregious than the charged offense, and posed no danger of confusing the jury. Nor do we believe that any inclination to punish appellant for his prior offenses was a significant factor in this case." (*Jennings, supra,* 81 Cal.App.4th at p. 1315.)

Here, like *Jennings*, evidence McNutt committed domestic violence against Michelle K. less than two years before the charged offenses, was relevant to whether he committed domestic violence here. Evidence McNutt previously punched Michelle K. and threatened her with a knife was certainly relevant to whether he attempted to murder her, committed first degree burglary, committed domestic violence, and falsely imprisoned her. McNutt concedes the evidence had "some relevance," although he asserts its probative value was reduced by the "volume" of *other* evidence presented concerning the charged offenses. That argument is best characterized as one concerning whether evidence is cumulative under Evidence Code section 352, not whether it is relevant under Evidence Code section 210 and 350.

As to whether the prior domestic violence evidence was unduly prejudicial, the trial court conducted the requisite weighing and concluded the evidence's "high" probative value outweighed any prejudicial effect. Again similar to *Jennings*, the prior

25

domestic violence evidence was no more inflammatory than the charged offenses, a point McNutt concedes. There was no risk the jury would be confused by the prior domestic violence evidence as it was a brief straightforward incident where McNutt punched Michelle K. and threatened her with a knife. Finally, although McNutt minimizes his punishment for the prior domestic violence, the parties stipulated he was convicted of assault with a deadly weapon and domestic violence, and the jury could reasonably infer he was punished for those crimes. Again, the ordinary rules of evidence do not implicate a defendant's federal constitutional rights. (*Marks, supra,* 31 Cal.4th at p. 227.)

McNutt relies on *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*), a case involving Evidence Code section 1109's parallel statute authorizing admission of prior sexual offense evidence, Evidence Code section 1108. His reliance on *Harris* is misplaced.

In *Harris, supra,* 60 Cal.App.4th at pages 731-732, defendant was charged with molesting two adult victims who had been patients at the mental health facility where he worked. Defendant molested the victims by undressing them, touching and licking their private parts, and by digital penetration. (*Ibid.*) The trial court permitted the prosecution to present evidence that 23 years before the charged crimes, defendant had been found guilty of residential burglary after entering an apartment at night and brutally beating, sexually assaulting, and stabbing the victim with an ice pick while she was sleeping. (*Id.* at pp. 733-734.) The *Harris* court, reversing defendant's conviction, concluded the trial court erred by admitting this evidence under Evidence Code sections 1108 and 352 because the prior sexual offense evidence was remote, was extremely inflammatory, and would confuse the jury by leading it to believe defendant had escaped all but burglary charges. (*Harris, supra,* 60 Cal.App.4th at pp. 738-739.) The court also concluded the prior sexual offense evidence was not probative because the only similarity between the charged and uncharged offenses was that all three victims were Caucasian women in their 20's or 30's. (*Id.* at p. 740.) *Harris* is inapposite.

26

As we explain above, the prior domestic violence evidence was no more inflammatory than the charged offenses, it was not remote as it occurred less than two years before the charged offenses, it was unlikely the jury would confuse the issues, and it was unlikely the jury would punish McNutt for the prior sexual offense because the jury could reasonably infer he had been punished as a result of his convictions stemming from the incident. Thus, the trial court properly admitted the prior domestic violence evidence pursuant to Evidence Code section 1109.

*2. Constitutionality of Evidence Code Section 1109*

In a related argument, McNutt contends Evidence Code section 1109 is unconstitutional in violation of the due process and equal protection clauses. He acknowledges that in *Falsetta, supra,* 21 Cal.4th at pages 912-913, the California Supreme Court rejected a due process challenge to Evidence Code section 1108, a related statute. He also acknowledges California appellate courts have rejected challenges to Evidence Code section 1109 based on both due process and equal protection. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233, fn. 14 [due process and equal protection]; *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703-704 [due process]; *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1120 [due process]; *People v. Price* (2004) 120 Cal.App.4th 224, 240 [due process and equal protection]; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1095-1096 [due process]; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1309-1313 [due process and equal protection]; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1332-1334 [due process]; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1028-1029 [due process]; *People v. Johnson* (2000) 77 Cal.App.4th 410, 416-420 [due process].) We find these opinions well reasoned, and we are persuaded to follow them.

McNutt argues, however, that *Falsetta* must be reconsidered in light of the Ninth Circuit's decision in *Garceau v. Woodford* (9th Cir. 2001) 275 F.3d 769 (*Garceau*). To the extent that *Falsetta* and *Garceau* are in conflict, we must follow

27

*Falsetta*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity Sales*) [California appellate court is bound by California Supreme Court decisions]; *Forsyth v. Jones* (1997) 57 Cal.App.4th 776, 782 [California appellate court is not bound by Ninth Circuit decisions].) Moreover, even after *Garceau*, our Supreme Court has expressly refused to reconsider *Falsetta*. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1288-1289.) We also note that, as McNutt concedes, a different panel of the Ninth Circuit reached a conclusion contrary to *Garceau*; it upheld a federal rule of evidence that was analogous to Evidence Code section 1109. (*United States v. LeMay* (9th Cir. 2001) 260 F.3d 1018, 1022, 1031.) We therefore conclude Evidence Code section 1109 does not violate the due process and equal protection clauses.

III. *Jury Instructions*

McNutt raises numerous instructional errors. We will address each in turn.

A. *CALCRIM No. 3500*

McNutt claims the trial court erred in failing to instruct the jury with CALCRIM No. 3500, "Unanimity,"[6] as to count 5, making a criminal threat, because he made "several separate and distinct threats . . . against [Michelle K.] and . . . [T.C.]" Relying on Michelle K.'s testimony that McNutt threatened to kill her 30 times throughout the night, McNutt cites to the following evidence to support his claim: (1) Michelle K.'s and T.C.'s testimony McNutt put a gun to T.C.'s head and threatened to kill him if Michelle K. did not obey him; (2) Michelle K.'s testimony that McNutt told her to tell T.C. to come back inside the house or he was going to kill her; (3) Michelle K.'s and T.C.'s testimony McNutt yelled to T.C. to come back inside the house or he was

---

6        CALCRIM No. 3500 provides: "The defendant is charged with _____ *<insert description of alleged offense>* [in Count __] [sometime during the period of __ to __]. [¶] The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

28

going to kill Michelle K.; and (4) Michelle K.'s testimony that when they were in the bedroom, McNutt threatened to kill both of them. Based on our review of the record, the threats were part of a continuous course of conduct, and the court was not required to instruct the jury sua sponte on unanimity.

In a criminal case, the constitutional right to jury unanimity requires that when a defendant is charged with a single criminal act and the evidence shows more than one such act, either the prosecution must select the specific act relied upon to prove the charge, or the jury must be instructed that it must agree unanimously that defendant committed the same act. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "The unanimity instruction is not required when the acts alleged are so closely connected as to form part of one transaction. [Citations.] Th[is] 'continuous conduct' rule [also] applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them. [Citation.]" (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100.)

Here, McNutt's threats to kill Michelle K. and T.C. were made during a continuous course of conduct. McNutt threatened to kill them on the evening of February 27, 2007, in the span of about an hour while they were at Michelle K.'s mother home. McNutt first threatened to kill T.C., then twice threatened to kill Michelle K., and then threatened to kill Michelle K., T.M., and himself. McNutt's threats were not discrete acts but instead were part of a single transaction.

McNutt's reliance on *People v. Butler* (2000) 85 Cal.App.4th 745 (*Butler*), and *People v. Melhado* (1998) 60 Cal.App.4th 1529 (*Melhado*), is misplaced. In *Butler,* 85 Cal.App.4th at pages 755-756, footnote 4, the court did not address the same issue we are confronted with here. In a footnote, the court said the prosecutor must make an election when the evidence discloses a greater number of events than those charged. The court did not address the issue of whether the continuous course of conduct rule applies.

29

In *Melhado, supra,* 60 Cal.App.4th at pages 1532-1533, defendant made two criminal threats about two hours apart to the employees of an auto repair shop. The first threat involved a face-to-face confrontation with the manager at the repair shop. (*Id.* at pp. 1533, 1538.) About two hours after the first threat, defendant returned to the repair shop with a fake grenade and threatened to blow up the shop. (*Ibid*.) The *Melhado* court held a unanimity instruction was required because "the evidence . . . established that appellant committed two acts of making terrorist threats, each of which could have been charged as a separate offense, yet the matter went to the jury on only one such offense." (*Id.* at p. 1539, fn. omittted.) *Melhado* is inapposite.

In *Melhado, supra,* 60 Cal.App.4th at page 1533, the threats were separated by a period of time in which the confrontation ended, defendant left the premises, and defendant returned two hours later. In contrast, here, the threats occurred during an ongoing argument separated only by conduct (McNutt physically and verbally terrorizing Michelle K. and T.C. for no more than one hour) that was part of a single transaction— the domestic violence incident. Thus, the trial court did not have a sua sponte duty to instruct the jury with CALCRIM No. 3500 on unanimity.

B. *CALCRIM No. 852*

McNutt contends that CALCRIM No. 852, "Evidence of Uncharged Domestic Violence," which instructs the jury on the various purposes for which the jury may consider evidence of prior acts of domestic violence, interferes with the presumption of innocence and the burden of proving defendant's guilt beyond a reasonable doubt. McNutt acknowledges that in *People v. Reliford* (2003) 29 Cal.4th 1007, 1012-1016, our high court addressed and rejected the precise claims he raises in this appeal. We are bound by decisions of our state Supreme Court, as he also acknowledges. (*Auto Equity Sales, supra,* 57 Cal.2d at p. 456.) Additionally, California appellate courts have also rejected the precise claim he raises on appeal. (*People v. Johnson* (2008)

30

164 Cal.App.4th 731, 738-740 [rejecting due process challenge to CALCRIM No. 852]; *People v. Reyes* (2008) 160 Cal.App.4th 246, 250-253 [same].) Therefore, we must reject McNutt's claim, which he concedes he has asserted primarily to preserve the issue for possible federal review.

C. *Lesser Included Offense of Misdemeanor Child Endangerment*

McNutt contends the trial court erred in failing to instruct the jury sua sponte on misdemeanor child endangerment as lesser included offenses of counts 6 and 7.[7] Not so.

Misdemeanor child abuse is a lesser included offense of felony child abuse. "If the act is done under circumstances or conditions likely to produce great bodily injury or death, it is a felony (§ 273a, subd. (a)); if not, the offense is a misdemeanor (§ 273a, subd. (b)). [Citation.]" (*People v. Moussabeck* (2007) 157 Cal.App.4th 975, 980.)

"[A] trial court must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present." (*People v. Lewis* (2001) 25 Cal.4th 610, 645.) By contrast, "it has long been settled that the trial court need not, even if requested, instruct the jury on the existence and definition of a lesser and included offense if the evidence was such that the defendant, if guilty at all, was guilty of the greater offense. [Citations.]" (*People v. Kelly* (1990) 51 Cal.3d 931, 959.)

McNutt's argument regarding the instructional error is based solely on his contention the evidence was insufficient to prove he acted under circumstances or conditions likely to produce great bodily harm or death. As we explain below, that is simply not true. The evidence at trial established an enraged and violent McNutt first pointed a gun at T.C. and threatened to kill him if Michelle K. did not obey his

---

[7] Although he does not specify the instruction, we assume McNutt claims the trial court had a sua sponte duty to instruct the jury with CALCRIM No. 823, "Child Abuse (Misdemeanor) (Pen. Code, § 273a[, subd.] (b))."

commands, and then pointed a gun at S.M. and M.M. and ordered them into the bathroom. From this evidence, we are certain this was a situation where the evidence was such that if McNutt was guilty, he was guilty of felony child endangerment or nothing at all. In other words, based on this evidence no reasonable juror would conclude a four-year-old child and a five-year-old child would not have a serious and well-founded risk of great bodily harm or death with a gun pointed at them. Thus, the court did not err in failing to instruct the jury sua sponte on misdemeanor child endangerment.

## D. *CALCRIM No. 330*

McNutt asserts CALCRIM No. 330, "Testimony of Child 10 Years of Age or Younger," which instructs the jury on how to evaluate a child's testimony, invaded the jury's province by bolstering M.M.'s credibility, prevented him from presenting a defense, and denied him the right to confront M.M. McNutt again acknowledges several appellate decisions have rejected his argument with respect to former CALJIC No. 2.20.1, the predecessor to CALCRIM No. 330. (*People v. McCoy* (2005) 133 Cal.App.4th 974, 979-980 (*McCoy*); *People v. Jones* (1992) 10 Cal.App.4th 1566, 1572-1574; *People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1392; *People v. Harlan* (1990) 222 Cal.App.3d 439, 455-457.) In fact, *McCoy* also rejected the implication CALCRIM No. 330 is invalid. (*McCoy, supra,* 133 Cal.App.4th at p. 980.) McNutt offers no new compelling justification to depart from this well-reasoned authority.

## IV. *Sufficiency of the Evidence-Counts 6 & 7*

McNutt contends insufficient evidence supports two of his convictions for felony child abuse, count 6 as to S.M., and count 7, with respect to M.M., because he did not act under circumstances or conditions likely to produce great bodily harm or death. Nonsense.

"""""The standard of review is well settled: On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid

32

value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]'''' [Citation.] ''''Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact].'''' [Citation.] 'Issues of witness credibility are for the jury. [Citations.]' [Citation.]" (*People v. Clark* (2011) 201 Cal.App.4th 235, 241-242.)

Section 273a, subdivision (a), provides: "Any person who, *under circumstances or conditions likely to produce great bodily harm or death*, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years." (Italics added.) "'[L]ikely'" as used in section 273a means a substantial danger, i.e., a serious and well-founded risk, of great bodily harm or death. (*People v. Wilson* (2006) 138 Cal.App.4th 1197, 1204.)

Here, the record includes sufficient evidence from which a jury could certainly conclude McNutt acted under circumstances or conditions likely to produce great bodily harm or death to four-year-old S.M. and five-year-old M.M. S.M. and M.M. witnessed McNutt put a gun to T.C.'s head and threaten to kill him if Michelle K. did not get on the ground. They witnessed an enraged McNutt physically restrain T.C. and struggle with Michelle K. McNutt then turned the gun on S.M. and M.M. and ordered them to get into the bathroom. At this point, the gun could have accidentally discharged as T.C. fled or in his struggle with Michelle K. This evidence supports the jury's determination McNutt's conduct caused S.M. and M.M. to reasonably fear for their lives as McNutt created an extremely dangerous situation that could have resulted in his children's deaths.

McNutt concedes he pointed the gun at his children, but claims he did not threaten them with it or attempt to shoot them. He even goes so far as to say "the only fair interpretation of the evidence is that [he]" tried to protect them by ordering them to the bathroom. Nonsense. To do that, he could have simply ordered them to the bathroom without pointing a gun at them. Sufficient evidence supports McNutt's conviction for felony child abuse in counts 6 and 7.

## DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.